**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, ex rel. KAMALA D. HARRIS, ATTORNEY GENERAL,<br><br>        Plaintiff,<br><br>        v.<br><br>FEDERAL HOUSING FINANCE AGENCY; EDWARD DeMARCO, in his capacity as Acting Director of FEDERAL HOUSING FINANCE AGENCY; FEDERAL HOME LOAN MORTGAGE CORPORATION; CHARLES E. HALDEMAN, Jr., in his capacity as Chief Executive Officer of FEDERAL HOME LOAN MORTGAGE CORPORATION; FEDERAL NATIONAL MORTGAGE ASSOCIATION; and MICHAEL J. WILLIAMS, in his capacity as Chief Executive Officer of FEDERAL NATIONAL MORTGAGE ASSOCIATION,<br><br>        Defendants.<br>_____/ | No. C 10-03084 CW<br>No. C 10-03270 CW<br>No. C 10-03317 CW<br>No. C 10-04482 CW<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, Docket No. 158, AND DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT, Docket No. 168. |

SONOMA COUNTY and PLACER COUNTY,

       Plaintiff and
       Plaintiff-Intervener,

   v.

FEDERAL HOUSING FINANCE AGENCY;
EDWARD DeMARCO, in his capacity
as Acting Director of FEDERAL
HOUSING FINANCE AGENCY; FEDERAL
HOME LOAN MORTGAGE CORPORATION;
CHARLES E. HALDEMAN, Jr., in his
capacity as Chief Executive
Officer of FEDERAL HOME LOAN
MORTGAGE CORPORATION; FEDERAL
NATIONAL MORTGAGE ASSOCIATION;
and MICHAEL J. WILLIAMS, in his
capacity as Chief Executive
Officer of FEDERAL NATIONAL
MORTGAGE ASSOCIATION,

       Defendants.
_____/

SIERRA CLUB,

       Plaintiff,

   v.

FEDERAL HOUSING FINANCE AGENCY;
and EDWARD DeMARCO, in his
capacity as Acting Director of
FEDERAL HOUSING FINANCE AGENCY,

       Defendants.
_____/

CITY OF PALM DESERT,

       Plaintiff,

   v.

FEDERAL HOUSING FINANCE AGENCY;
FEDERAL NATIONAL MORTGAGE
ASSOCIATION; and FEDERAL HOME
LOAN MORTGAGE CORPORATION,

       Defendants.
_____/

**United States District Court**
For the Northern District of California

2

United States District Court
For the Northern District of California

California, Sonoma and Placer Counties, the City of Palm Desert and the Sierra Club have sued the Federal Housing Finance Agency (FHFA), its director, the Federal National Housing Association (Fannie Mae) and the Federal Loan Mortgage Corporation (Freddie Mac).[1]  The lawsuits challenge actions by the FHFA, Fannie Mae and Freddie Mac which have thwarted certain federally funded, state and locally administered initiatives known as Property Assessed Clean Energy (PACE) programs.[2]  Through PACE programs, state and local governments finance energy conservation property improvements with debt obligations secured by the retrofitted properties.  The programs are intended to foster the use of renewable energy, energy and water efficiency, and the creation of jobs.  Congress has allocated substantial federal funding to support the expansion of PACE programs nation-wide, and the executive branch of the federal government has engaged in extensive inter-agency coordination efforts to advance the implementation of PACE programs.

[1] The claims against Defendants Charles E. Halderman, Jr. and Michael J. Williams, who were sued in their official capacities as Chief Executive Officers for Fannie Mae and Freddie Mac, were previously dismissed.  No. C 10-03084, Docket No. 83; No. C 10-03270, Docket No. 93.

[2] Three similar cases have been filed in federal district courts in Florida and New York: The Town of Babylon v. Federal Housing Finance Agency, et al., 2:10-cv-04916 (E.D.N.Y); Natural Resource Defense Council, Inc. v. Federal Housing Finance Authority, et al., 1:10-cv-07647-SAS (S.D.N.Y.); and Leon County v. Federal Housing Finance Agency, et al., 4:10-cv-00436-RH (N.D. Fla.).  All three actions have been dismissed, and appeals are pending.

Plaintiffs allege that Defendants have violated the Administrative Procedures Act (APA) and the National Environmental Policy Act (NEPA).[3]  The parties dispute the nature of the debt obligations created by PACE programs, and the extent to which the obligations create risks for secondary mortgage holders, such as Fannie Mae and Freddie Mac, collectively referred to as the Enterprises.  The FHFA has taken the position that PACE programs that result in lien obligations which take priority over mortgage loans complicate and make more expensive alienation of the encumbered properties and, thus, pose risk to the security interests of entities that purchase the mortgages for investment purposes.  Plaintiffs claim that (1) Defendants disregarded statutorily imposed procedural requirements in adopting rules about the PACE debt obligations; (2) Defendants' rules were substantively unlawful because they were arbitrary and capricious; and (3) the rule-making process failed to comply with environmental laws.

Plaintiffs have jointly moved for summary judgment on all claims.  Defendants have opposed the motion and cross-moved for summary judgment.  Having considered all of the parties' submissions and oral argument, the Court grants Plaintiffs' motion for summary judgment that Defendants failed to comply with the

---

[3] The Court previously dismissed Plaintiffs' claims under various state laws and the Constitution's Tenth Amendment and Spending Clause.

APA's notice and comment requirement and denies Defendants' cross-motion for summary judgment.

BACKGROUND

In 2008, California approved legislation to allow cities and counties to create PACE programs, through which property owners may enter into contracts for assessments to finance the installation of energy efficiency or renewable energy improvements that are permanently fixed to residential (including multi-family), commercial, industrial, or other real property.[4] AB 811, Ch. 159, Stats. 2008. In many, but not all, PACE programs, property owners repay the assessments with their property taxes, and the liens associated with the assessments are given priority over previously-recorded private liens, such as mortgages.

Also in 2008, Congress enacted the Housing and Economic Recovery Act of 2008 (HERA), Public Law 110-289, 122 Stat. 2654. Through this law, Congress established the FHFA to regulate and oversee the Enterprises, as well as the Federal Home Loan Banks (FHL Banks), which together largely control the country's secondary market for residential mortgages. The HERA amended the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, 12 U.S.C. § 4501 et seq. (Safety and Soundness Act). That Act outlines the regulatory and oversight structure for the

---

[4] In 2009, the state legislature expanded the law, authorizing PACE financing for water efficiency improvements. AB 474, Ch. 444, Stats. 2009.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Enterprises and the FHL Banks.  12 U.S.C. § 4502(20).  As amended by the HERA, the Safety and Soundness Act vests in the FHFA the authority to act as a conservator and receiver for the Enterprises and the FHL Banks, together referred to as the regulated entities. 12 U.S.C. §§ 4511(b); 4617(a).

The Safety and Soundness Act also establishes a tiered system of classification of the capitalization of the regulated entities. As of June 30, 2008, James B. Lockhart III, then director of the FHFA, classified the Enterprises as undercapitalized, pursuant to his discretionary authority under the statute.  Pls.' Second Request for Judicial Notice, Ex. 6 at 2.  On September 7, 2008, Lockhart placed the Enterprises in FHFA conservatorship.  Id.

On February 17, 2009, Congress approved the American Recovery and Reinvestment Act of 2009 (Recovery Act), Public Law 111-5, 123 Stat. 115, which, among other things, allocated eighty billion dollars to projects related to energy and the environment. Plaintiffs' Excerpts of Administrative Record (Plaintiffs' Excerpts), Docket No. 182, Exhibit B, White House Middle Class Task Force and White House Council on Environmental Quality, "Recovery Through Retrofit" Report, October 2009 (Retrofit Report), at 2.  The Act provided state and local governments with an "unprecedented opportunity to expand investments in energy retrofits and develop community-based programs on a large scale." Id.

The California Energy Commission was charged with administering and distributing the Recovery Act funds allocated to the state.  According to Karen Douglas, the Chair of the Commission from February 2009 to February 2011, the federal Department of Energy (DOE) allocated $49.6 million in Recovery Act funds for an Energy Efficiency and Conservation Block Grant Program.  PACE programs, among other projects, were eligible for block grant funding.

The DOE also allocated to the Energy Commission $226 million in Recovery Act funds for the State Energy Program (SEP).  The DOE encouraged states to develop energy strategies that align with the national goals of increasing jobs, reducing the United States' oil dependence through increases in energy efficiency and the deployment of renewable energy technologies, promoting economic vitality through an increase in "green jobs," and reducing greenhouse gas emissions.  On February 10, 2010, the Energy Commission awarded thirty million dollars in SEP funding to five municipal PACE programs.  The awards for these PACE programs were expected to leverage $370 million, create 4,353 jobs, save over 336 million kilowatt-hours of energy, and avoid emissions of 187,264 tons of greenhouse gases over the contract period. Douglas Dec. at ¶ 12.

High level federal and state officials participated in efforts to advance the PACE program nation-wide.  Beginning in May 2009, the White House Council on Environmental Quality (CEQ) and

7

the Office of the Vice President facilitated an interagency process, involving eleven departments and agencies and six White House Offices,[5] to develop recommendations for federal action to increase green job opportunities and boost energy savings by retrofitting homes for energy efficiency.  Retrofit Report at 5.

In a letter dated June 18, 2009, Director Lockhart advised banking and creditor trade groups, as well as associations for mortgage regulators, governors and state legislators, of "an emerging trend in state and local financing for residential energy efficiency home improvements."  He explained the FHFA's belief that the programs "will help improve our use of resources and, in the long term, keep down the costs of home ownership," but that "such programs must be carefully crafted to avoid unintended consequences for homeowners and lenders."  Plaintiffs' Excerpts, Ex. A.

On October 12, 2009, then California Attorney General Edmund G. Brown, Jr., contacted Lockhart regarding his June 18, 2009 letter.  The Attorney General emphasized that under California law

---

[5] The following departments and agencies participated: Office of the Vice President, Department of Agriculture, Department of Commerce, Department of Education, Department of Energy, Department of Housing and Urban Development, Department of Labor, Department of Treasury, Environmental Protection Agency, Equal Employment Opportunity Commission, General Services Administration and Small Business Administration, as well as Council of Economic Advisers, Domestic Policy Council, National Economic Council, Office of Management and Budget, Office of Public Engagement and Intergovernmental Affairs and Office of Science and Technology Policy from the Executive Office of the President.

the debt obligations were properly treated as assessments, and asserted that "proper PACE program design" could overcome the FHFA's concerns.  Plaintiffs' Excerpts, Ex. C.

In October of that year, the White-House-led interagency effort culminated in the release of a report entitled, "Recovery Through Retrofit," announcing a federal proposal to expand PACE programs.  On October 18, 2009, the White House released its "Policy Framework for PACE Financing Programs."  Varma Dec., Ex. 20.  The framework provided guidance to federally supported pilot and demonstration level PACE programs.

With respect to homeowner protections, the framework encouraged the voluntary adoption of three measures to ensure that PACE-financed energy retrofits would pay for themselves within a reasonable time, and that homeowners would be protected against fraud or substandard work.  First, the framework called for "savings to investment ratios" for PACE program assessments to be greater than one; that is, the expected average monthly utility savings to homeowners should be greater than the expected monthly increase in tax assessments due to the PACE energy efficiency or renewable energy improvements.  Second, the framework recommended that PACE financing be limited to investments that have a high return in terms of energy efficiency gains.  Third, the framework advised that PACE programs should ensure that the retrofits would be constructed as intended.  That is, the scope of the retrofit should be determined by a list of presumptively efficient projects

or should be based on an energy audit; licensed contractors or installers should carry out the home improvements; and PACE programs should institute a quality assurance protocol to verify that the home improvements are completed and satisfy required standards.

The framework also announced parameters to limit risks to mortgage lenders. These elements of the framework recommended a reserve fund established at the local level to protect against late payments or non-payments of the assessment; a requirement that the length of time for a homeowner to repay the PACE assessments should not exceed the life expectancy of the energy efficient improvements; a general limitation on the amount of PACE financing to ten percent of the appraised value of the home; assurances of clear title to the property, current property taxes and mortgage payments, and an absence of outstanding or unsatisfied tax liens, notices of default or other property-based debt delinquencies; and an absence of existing mortgages or other debt on the property in an amount that exceeds the value of the property. Finally, the framework called for the imposition of escrow payments for PACE assessments and precautions in establishing PACE programs in areas experiencing large declines in home prices.

On October 29, 2009, FHFA Acting Director Edward DeMarco replied to the letter Attorney General Brown had sent to Lockhart. Plaintiffs' Excerpts, Ex. D. DeMarco's letter did not mention the

White House Retrofit Report or policy framework released earlier

that month, but stated that the FHFA was working with other

federal departments and agencies to identify and promote best

practices so as to align improved energy efficiency, consumer

protection, and prudent lending goals.  Id.

On February 16, 2010, the FHFA produced a document entitled,

"Market and Legal Issues Related to Energy Loan Tax Assessment

Programs (ELTAPs)/PACE (Property Assessed Clean Energy) Programs."

Varma Dec., Ex. 43.  In the document, the FHFA discussed a number

of deficiencies in PACE programs, including the absence of any

national model for appropriate lending standards for PACE and

ELTAP programs, the creation of unnecessary market disruptions by

first liens, the absence of retrofit standards, complications

arising from the reliance of PACE programs on subsidies, such as

tax credits and utility firm rebates, to generate energy savings,

and, finally, the existence of alternatives to ELTAP, through

established leasing programs for residential solar energy systems.

The FHFA explained that the priority of PACE liens over mortgage

liens increased uncertainty and created difficulties in

determining the value of holdings impacted by PACE encumbrances.

Id. at 3.

The FHFA described the following scenario to explain that, in

a property sale triggered by an unpaid assessment, the mortgage

lender becomes the guarantor of the PACE assessment.  Id. at 5.

In the event of the sale of a homeowner's property for a

United States District Court
For the Northern District of California

delinquent PACE lien, other liens, including the first mortgage, are eliminated.  When a homeowner becomes delinquent on the payment of property tax assessments, the mortgage lender would receive notice and would have to pay the arrearage to prevent a tax sale and avoid losing its lien on the security property.  The lender would have to pay the PACE lien assessment for the same reason.  If the mortgage lender was not in control of the sale of the property, the lender could lose its entire monetary interest in the property; there would be no incentive in a tax sale to garner more than the amount of the tax arrearage.  Further, the amount of the tax arrearages would be uncertain.

In addition, subsequent purchasers of a PACE-encumbered property could discount their purchase offers to account for the total assessments owed, affecting the lender's ability to recoup the property value.

The FHFA noted that some municipalities required priority liens for PACE and ELTAP loans.  Id. at 3.  The FHFA stated, "The eighteen states that have authorized programs should engage with the federal government in pilot programs that test various models (including those without first liens and those that employ greater private sector administration both of lending and energy retrofitting)."  Id. at 8.  However, Defendants acknowledge that Barclays Capital has explained to PACE advocates that bonds backed by PACE liens without first-lien priority likely would be rated "as non-investment grade and therefore will have limited buyer

**United States District Court**
For the Northern District of California

appeal while also demanding high interest rates." Varma Dec., Ex. 22.

On March 5, 2010, Freddie Mac sent a confidential letter to the FHFA, highlighting the growing number of states approving legislation to enable the establishment of PACE programs, generally relying on a priority lien to secure the improvements.[6] Freddie Mac reiterated its concerns about such programs. Varma Dec., Ex. 26. The letter, copies of which were sent to DeMarco, FHFA General Counsel Alfred Pollard and other agency executives, discussed the first lien position of the assessments and explained that the size of the loans could be substantial. Freddie Mac further explained that, because the liens could be placed after the first mortgage lien was created, the mortgage holder may not be aware that its lien has been subordinated until it or the local entity initiates foreclosure. In addition, Freddie Mac expressed concern that the lack of required underwriting standards, along with the failure to set loan-to-value limits, was likely to result in many borrowers obtaining loans that they were unable to repay.

Freddie Mac stated that no uniform set of best practices existed to mitigate the risks it faced as a result of the

---

[6] Freddie Mac noted that such laws had been approved in California, Colorado, Florida, Hawaii, Illinois, Louisiana, Maryland, Nevada, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Texas, Vermont, Virginia and Wisconsin, and similar legislation had been introduced in Arkansas, Arizona, Iowa, Maine, Michigan, Nebraska, New Hampshire, Rhode Island, South Carolina, Washington and West Virginia.

programs, despite months of efforts it had undertaken, in collaboration with the FHFA and other agencies, to develop such standards.  Accordingly, Freddie Mac requested FHFA approval to take the following measures: (1) reinforce existing contractual rights under the Freddie Mac Single-Family Seller/Servicer Guide and the Freddie Mac/Fannie Mae Uniform Security Instrument; (2) establish new due diligence requirements for servicers; and (3) restrict Freddie-Mac-approved seller/servicers from financing energy loans that would subordinate existing Freddie Mac mortgages.  Freddie Mac stated that the measures were warranted given the proliferation of PACE programs, and were consistent with the FHFA's goal as conservator to maintain Freddie Mac's assets and minimize its losses during conservatorship.

On May 5, 2010, Fannie Mae and Freddie Mac both issued letters to their mortgage sellers and servicers, again addressing concerns about PACE programs.

On May 7, 2010, the DOE issued "Guidelines for Pilot PACE Financing Programs," providing "best practices guidelines to implement the Policy Framework for PACE Financing Programs announced on October 18, 2009."  Plaintiffs' Excerpts, Ex. H; Varma Dec., Ex. 41.  The best practices called for local governments to consider the following requirements: (1) the expected savings-to-investment ratio should be greater than one; (2) the term of the assessment should not exceed the useful life of the improvements; (3) the mortgage holder of record should

receive notice when PACE liens are placed; (4) PACE liens should not accelerate upon property owner default; (5) the assessments should not exceed ten percent of a property's estimated value; (6) quality assurance and anti-fraud measures should be implemented, such as the use of validly licensed auditors and contractors only; (7) rebates and tax credits should be considered in determining the appropriate financing structure; (8) education programs for PACE program participants should be carried out; (9) a debt service reserve fund should be established; and (10) data should be collected.  The DOE also announced best practices for underwriting PACE assessments.  The DOE called for (1) verification of property ownership, specifically, clear title, location of the property in a financing district, and other restrictions; (2) proper evaluation of existing property-based debt and the worth of the property; and (3) a determination of the property owner's ability to pay.

In a May 24, 2010 letter, the DOE sought clarification from the FHFA regarding Fannie Mae and Freddie Mac's May 5, 2010 lender letters.  The DOE requested from the FHFA "as soon as practicable guidelines and parameters that experimental pilot PACE financing programs should follow so that their operations can proceed without encountering adverse action by the Government Sponsored Entities (GSEs) under your conservatorship."  Plaintiffs' Excerpts, Ex. M.  The DOE sought "specific criteria the financial

regulatory community believes is necessary to enable these experimental pilot PACE financing programs to proceed." Id.

On July 6, 2010, the FHFA issued a statement that the PACE programs "present significant safety and soundness concerns that must be addressed by Fannie Mae, Freddie Mac and the Federal Home Loan Banks." The FHFA stated that first liens created by PACE programs were different from "routine tax assessments," and posed significant risks to lenders, servicers, and mortgage securities investors. The FHFA "urged state and local governments to reconsider these programs" and called "for a pause in such programs so concerns can be addressed." The FHFA directed Fannie Mae, Freddie Mac and the FHL Banks to undertake "prudential actions," including reviewing their collateral policies to assure no adverse impact by PACE programs. Although Defendants take the position that the FHFA issued this statement in its capacity as

United States District Court
For the Northern District of California

conservator as well as that of regulator, the statement itself did not say so, or cite any statutory or regulatory provision.[7]

On August 31, 2010, Fannie Mae and Freddie Mac, citing the FHFA's July 2010 statement, announced to lenders that they would not purchase mortgages originated on or after July 6, 2010, which were secured by properties encumbered by PACE obligations.

On February 28, 2011, after the hearing on Defendants' motion to dismiss the present actions but before the Court issued its order, the FHFA's General Counsel sent a letter to General Counsel for Fannie Mae and Freddie Mac, reaffirming that debts arising from PACE programs pose significant risks to the Enterprises.  The

---

[7] On August 16, 2010, the FHFA issued proposed guidance regarding private transfer fee covenants.  75 Fed. Reg. 49932. The proposed guidance would have advised the Enterprises not to purchase or invest in any mortgages encumbered by private transfer fee covenants or securities backed by such mortgages and discouraged the FHL Banks from purchasing or investing in such mortgages or securities or holding them as collateral for advances.  The FHFA did not adopt this guidance in final form. After receiving several thousand comments on it, the FHFA decided to address the issue through a regulation, rather than guidance. 76 Fed. Reg. 6702.  On February 8, 2011, the FHFA proposed a regulation narrower in scope than the proposed guidance.  The proposed regulation would have prohibited the regulated entities from dealing in mortgages on properties encumbered by certain types of private transfer fee covenants, rather than any such covenant.  The final rule, adopted March 16, 2012, prohibits regulated entities from purchasing, investing or otherwise dealing in any mortgages on properties encumbered by private transfer fee covenants, securities backed by such mortgages, or securities backed by the income stream from such covenants, except for private transfer fee covenants that require payment of a fee to a covered association, such as homeowner and condominium associations, and that limit use of such transfer fees exclusively to purposes which provide a direct benefit to the real property encumbered by the private transfer fee covenant.  12 C.F.R. §§ 1228.1 and 1228.2; 77 Fed. Reg. 15566-01.

FHFA invoked its statutory authority as conservator and directed that the "Enterprises shall continue to refrain from purchasing mortgage loans secured by properties with outstanding first-lien PACE obligations."  In addition, the letter ordered that the "Enterprises shall continue to operate in accordance with the Lender Letters and shall undertake other steps necessary to protect their safe and sound operations from these first-lien PACE programs."

FHFA General Counsel Pollard attested that the FHFA received input from the Enterprises and PACE stakeholders, as well as federal financial institution regulators, regarding the risks posed by PACE programs.  According to Pollard, the FHFA found that the DOE best practices guidelines were an unsatisfactory response to its concerns because they did not proscribe the use of priority liens, they continued to allow collateral-based lending, and there was no enforcement mechanism to ensure that PACE programs throughout the country complied with the DOE guidelines.  Pollard did not attest that the FHFA had considered alternatives to its blanket prohibition against the purchase of PACE-encumbered mortgages or that it had considered the impact on the public interest of blocking the PACE programs, other than minimizing risks for the Enterprises.  Nor have Defendants presented evidence that the FHFA weighed the costs associated with the risk exposure produced by PACE programs against the economic benefits of

allowing PACE programs to continue to expand and build a market for residential energy conservation projects.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

DISCUSSION

I. Statutory Preclusion of Judicial Review

Defendants argue that they are entitled to summary judgment because 12 U.S.C. §§ 4617(f) and 4623(d) preclude judicial review of Plaintiffs' claims for relief.

The courts have long recognized a presumption in favor of judicial review of administrative actions. Love v. Thomas, 858 F.2d 1347, 1356 (9th Cir. 1988) (citing Block v. Community Nutrition Inst., 467 U.S. 340, 349-51 (1984)). The presumption may be overcome by various means, including "specific language or specific legislative history that is a reliable indicator of congressional intent," or "by inference of intent drawn from the statutory scheme as a whole." Block, 467 U.S. at 349. Although "great weight" is ordinarily given to an agency's interpretation of a statute it is charged with enforcing, "that deference does not extend to the question of judicial review, a matter within the peculiar expertise of the courts." Love, 858 F.2d at 1352 n.9.

A. Section 4617(f)

Section 4617(a) authorizes under certain circumstances the discretionary or mandatory appointment of the FHFA as conservator or receiver for a regulated entity. 12 U.S.C. § 4617(a). As conservator, the FHFA immediately succeeds to "all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director of such regulated entity" with respect to the entity and its assets. 12 U.S.C. § 4617(b)(2)(A).

It may take over assets and operate the regulated entity; conduct all business of the regulated entity; collect all obligations and money due; perform all functions of the regulated entity in its name which are consistent with the FHFA's appointment as conservator or receiver; preserve and conserve the entity's assets and property; and provide by contract for assistance in fulfilling any function, activity, action, or duty as conservator or receiver. 12 U.S.C. § 4617(b)(2)(B)(i)-(v). In addition, the FHFA's specifically enumerated powers as conservator authorize it to take such action as may be "necessary to put the regulated entity in a sound and solvent condition." 12 U.S.C. § 4617(b)(2)(D)(i)-(ii).

Section 4617(f) limits judicial review of such actions, stating that "no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver." 12 U.S.C. § 4617(f).

Distinct from the FHFA's powers as a conservator or receiver, it has supervisory and regulatory authority over the regulated entities. See 12 U.S.C. §§ 4511(b); 4513b; 4513(a)(1)(A) and (B)(i)-(v). It is clear from the statutory scheme overall and other provisions of § 4617 that Congress distinguished between the FHFA's powers as a conservator and its authority as a regulator, and did not intend that the former would be limitless and subsume the latter. Although Congress intended to ensure the FHFA's ability to act freely as a conservator by preempting judicial

21

United States District Court
For the Northern District of California

review under § 4617(f), as well as granting far-reaching powers, the FHFA must show that it was acting as a conservator, rather than a regulator.  The appropriate characterization of the FHFA's actions is a matter of degree.

Defendants contend that the FHFA issued its July 2010 statement and February 2011 letter as conservator of the Enterprises.  Defendants assert that the directives were a business decision by the FHFA intended to minimize the Enterprises' credit loses while in conservatorship.  Plaintiffs respond that the FHFA's actions amount to substantive rule-making, which can only be done in the FHFA's role as regulator, rather than as conservator.  For the reasons discussed below, the Court agrees with Plaintiffs.

The FHFA directed Fannie Mae, Freddie Mac and the FHL Banks prospectively to refrain from purchasing a class of mortgage loans, namely, those secured by property with an outstanding PACE first lien.  These directives did not involve succeeding to the rights or powers of the Enterprises, taking over their assets, collecting money due or operating their businesses, in keeping with the FHFA's conservatorship authority.

Specific provisions of § 4617 include the phrase, "The agency may, as conservator . . .," in reference to the FHFA's authority in that role, while other provisions addressing the FHFA's regulatory powers do not contain analogous language.  Compare 12 U.S.C. § 4617(b)(1) and (2)(C) with § 4617(b)(2)(A), (B), (G),

(H), (I)(i)(I) and (J)[8] and § 4617(b)(4).  This supports that Congress intended to enumerate the FHFA's powers and duties as a conservator, while delegating other duties to the FHFA's regulatory authority.

In Morrison-Knudsen Co., Inc. v. CHG International, Inc., 811 F.2d 1209 (9th Cir. 1987), the Ninth Circuit declined to hold that the Federal Savings and Loan Insurance Corporation's authority to adjudicate creditor claims was in keeping with the ordinary functions of a receiver.  The Ninth Circuit found that the language in the relevant statute failed to enumerate, and the statutory scheme did not support, a receivership power to adjudicate creditor claims.  Id. at 1218-20.  Similarly here, the Safety and Soundness Act does not enumerate, and its statutory scheme does not support, the FHFA's authority as conservator to establish broad, prospective rules regarding classes of mortgages that are eligible for purchase by the regulated entities.

In other cases upon which Defendants rely, federal agencies undertook the ordinary day-to-day functions of an entity acting as conservator or receiver to wind up the affairs of the failed financial institutions.  See e.g., Ward v. Resolution Trust Corp., 996 F.2d 99, 104 (5th Cir. 1993) (finding that the district court was without jurisdiction to enjoin the sale of certain real

---

[8] Although § 4617(b)(2)(J) is a broad, catchall provision, given the overall statutory scheme, it should not be read to authorize the FHFA to do anything and everything, including engaging in rule-making, as a conservator.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

property because disposing of the assets of the failed bank was a "routine 'receivership' function"); In re Landmark Land Co. of Okla., Inc., 973 F.2d 283, 290 (4th Cir. 1992) (holding that the Resolution Trust Corporation (RTC),[9] as a conservator, had authority, beyond the reach of the district court's injunctive power, to call a meeting of the shareholders to elect new management).

Defendants also cite Barrows v. Resolution Trust Corporation, 39 F.3d 1166 (1st Cir. 1994).[10]  There, the First Circuit held that § 1821(j)[11] barred a district court from ordering the RTC, the appointed receiver, to make certain loans to which the plaintiff claimed he was entitled.  Id. at *3.  Barrows held that the RTC's directive blocking a failed financial institution from extending a

---

[9] Through the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), Congress authorized the RTC "to take all actions necessary to resolve the problems posed by a financial institution in default." Gross v. Bell Sav. Bank PaSA, 974 F.2d 403, 406 (1992) (citing H.R. Rep. No. 101-54).  Defendants cite Kuriakose v. Federal Home Loan Mortgage Corporation, 674 F. Supp. 2d 483, 493 (S.D.N.Y. 2009), for the proposition that the courts applying § 4617(f), may turn to precedent relating to the nearly identical anti-injunction statute under the FIRREA.

[10] Barrows is an unpublished per curiam opinion referred to in the Federal Reporter at 39 F.3d 1166, in a "Table of Decisions Without Reported Opinions."

[11] The parties agree that the language in § 4617(f) is similar to that in 12 U.S.C. § 1821(j), which limits judicial review of actions taken by the Federal Deposition Insurance Corporation (FDIC) in its capacity as a conservator or receiver.  Sahni v. American Diversified Partners, 83 F.3d 1054, 1058-59 (9th Cir. 1996).

United States District Court
For the Northern District of California

loan was an action of a conservator to preserve and conserve the assets and property of the failed institution.

Defendants contend that, under Barrows, the FHFA's action with respect to the PACE programs was akin to a business decision preventing the institution from making a particular investment, as necessary to conserve and preserve the assets of the Enterprises while in conservatorship. The directives that the FHFA issued to the Enterprises and the FHL Banks differ from the receiver's decision in Barrows because the former broadly and prospectively prohibited all three of the regulated entities from the purchase of an entire class of mortgages, while the latter involved a receiver's decision not to make a particular loan. Barrows does not establish that the FHFA was acting as a conservator here.

The FHFA's directives here resemble an FHFA rule regarding private transfer fee covenants. A property owner or another private party may attach private fee covenants to real property, providing for payment of a transfer fee to an identified third party upon each resale of the property. Id. 76 Fed. Reg. 6702-02, *6703. The fee typically is stated as a fixed amount or as a percentage of the property's sales price and often exists for a period of ninety-nine years. Id. As described above, the FHFA initially sought public comment on proposed guidance to the Enterprises and the FHL Banks that they should not purchase or invest in mortgages on properties encumbered by private transfer fee covenants. 75 Fed. Reg. 49932-01 at *49932. After receiving

United States District Court
For the Northern District of California

extensive comments regarding the proposed guidance, the FHFA decided to address the subject by regulation rather than through guidance and filed a notice of proposed rule-making.  76 Fed. Reg. 6702-02, *6703.  Among other concerns raised in its notice of proposed rule-making, the FHFA pointed out the risk that private transfer fees may not benefit homeowners or may not be disclosed adequately, thus impeding the transferability, marketability and valuation of the encumbered properties.  Id. at *6703-04.

The FHFA then proposed a narrower regulation, received further comment, and adopted, on March 16, 2012, a final rule prohibiting the regulated entities, except in certain circumstances, from purchasing, investing or otherwise dealing in any mortgages on properties encumbered by private transfer fee covenants, securities backed by such mortgages, or securities backed by the income stream from such covenants, and barring the FHL Banks from accepting such mortgages or securities as collateral.  12 C.F.R. § 1228; 77 Fed. Reg. 15566-01 (March 16, 2012).

Because private transfer fee covenants and PACE first liens are analogous, the fact that the FHFA followed notice and comment rule-making procedures when regulating the former makes it reasonable to infer that it was acting as a regulator when it issued its directives about the latter.

Furthermore, the FHFA's directives applied to the FHL Banks, as well the Enterprises.  The fact that they bound all three

26

United States District Court
For the Northern District of California

1  regulated entities, rather than just the entities in

2  conservatorship, supports the conclusion that the FHFA was acting

3  as a regulator, rather than a conservator.

4      The FHFA's February 2011 letter, asserting that it was acting

5  as a conservator, was created during the pendency of this

6  litigation and was addressed to general counsel for the

7  Enterprises.  The letter is a post-hoc effort by the FHFA to

8  characterize its July 6, 2010 statement.

9      Contrary to Defendants' argument, National Trust for Historic

10 Preservation v. FDIC, 21 F.3d 469 (D.C. Cir. 1994), does not

11 establish that the FHFA has discretion to decide whether it acts

12 in its capacity as conservator or as regulator.  There, the D.C.

13 Circuit held that the FDIC had discretion to determine whether it

14 acted in its capacity as a receiver or its capacity as a corporate

15 insurer.  Id. at 471.  It does not follow that Congress intended

16 the FHFA to have similar discretion because the scope of the

17 FHFA's powers as regulator is different from, and substantially

18 greater than, the FDIC's authority as a corporate insurer.

19 Furthermore, even if the FHFA had discretion to act as a

20 conservator or regulator with respect to a given issue, the FHFA

21 may not decide arbitrarily to act in different capacities for two

22 decisions that are substantially similar.

23     Given the presumption in favor of judicial review, to invoke

24 § 4617(f), Defendants bear the burden to establish that the FHFA

25 was acting as conservator, to restore or protect the solvency of

the Enterprises.  Defendants have not carried this burden.

Section 4617 does not preclude judicial review here.

B. Section 4623(d)

Defendants also argue that their actions in connection with the PACE programs are exempt from judicial review pursuant to 12 U.S.C. § 4623(d).  This provision restricts judicial review of any action taken under § 4616(b)(4).  Section 4616(b)(1) through (4) describes supervisory actions that the FHFA Director may take with respect to "significantly undercapitalized" regulated entities.  Section 4616(b)(4) authorizes the Director to require a "significantly undercapitalized" regulated entity "to terminate, reduce, or modify any activity that the Director determines creates excessive risk to the regulated entity."  As noted earlier, the Safety and Soundness Act establishes a tiered system of classification of the capitalization of the regulated entities; "significantly undercapitalized" is the second lowest of the four tiers.  See 12 U.S.C. § 4614(a) and (b)(1)(C).

Defendants have not produced evidence that prior to, or even contemporaneously with, the July 2010 statement or the February 2011 letter, the Enterprises were categorized as significantly undercapitalized within the meaning of § 4614.  Nothing in the July 2010 statement refers to § 4616(b)(4), or makes reference to undercapitalization.

Furthermore, on October 9, 2008, the FHFA had issued a press release announcing that the FHFA Director "had determined that it

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

[was] prudent and in the best interests of the market to suspend capital classifications of Fannie Mae and Freddie Mac during the conservatorship, in light of the United States Treasury's Senior Preferred Stock Purchase Agreement." Pls.' Second Request for Judicial Notice, Ex. 6 at 2. The FHFA explained, "The Director has the authority to make a discretionary downgrade of the capital adequacy classification should certain safety and soundness conditions arise that could impact future capital adequacy. This classification requirement serves no purpose once an Enterprise has been placed into conservatorship." Id. at 2-3.

Neither Defendants' interrogatory responses nor Pollard's declaration establishes that, at the time of the FHFA's directives, the Enterprises had been categorized as significantly undercapitalized based on their "negative core capital," "negative total equity" or their positions below the "Requirement Minimum Capital." The responses and the declaration only show that, looking back at the financial metrics, the FHFA believes that the Enterprises at the relevant time met the statutory definition of "significantly undercapitalized."

Thus, the FHFA has not presented evidence that it acted pursuant to its conservatorship powers authorized under § 4616(b)(4). Section 4623(d) does not limit the Court's jurisdiction to hear Plaintiffs' claims.

In sum, neither § 4617(f) nor § 4623(d) of Title 12 of the United States Code bars judicial review of Defendants' directive on PACE financing.

II. Administrative Procedures Act

Plaintiffs allege that Defendants' rule on PACE obligations failed to comply with the notice and comment requirements of, and was arbitrary and capricious in violation of, the APA, 5 U.S.C. §§ 553, 706(2)(D).

A. Requirements for judicial review under the APA

To invoke judicial review of agency action under the APA, Plaintiffs must demonstrate prudential standing.  Prudential standing is a "purely statutory inquiry," rather than a constitutional test, and determines "whether a particular plaintiff has been granted a right to sue by the statute under which he or she brings suit."  City of Sausalito v. O'Neil, 386 F.3d 1186, 1199 (9th Cir. 2004).  "For a plaintiff to have prudential standing under the APA, 'the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute . . . in question.'"  Nat'l Credit Union Admin. v. First National Bank & Trust Co., 522 U.S. 479, 488 (1998) (alteration in original).  The test requires that "we first discern the interest 'arguably . . . to be protected' by the statutory provision at issue; we then inquire whether the plaintiff's interests affected by the agency action in question are among them."  Id. at 492.  A plaintiff is

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

outside a provision's zone of interest where "the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." Clarke v. Securities Industry Ass'n, 479 U.S. 388, 399 (1987).

The governmental Plaintiffs satisfy the requirements for prudential standing. The parties agree that the paramount goal of the Safety and Soundness Act is to protect the stability and ongoing operation of the residential mortgage market, and the interests of the state and municipalities depend on its stability. California and its municipalities have created a system of state and local laws and assessments, and they establish budgets that hinge on a functional real estate market. A healthy mortgage market is a foundational element of the real estate market. Although Congress has not expressed a specific purpose to benefit state and local governments through the Safety and Soundness Act, the governmental Plaintiffs share an interest in a safe and sustainable secondary mortgage market and suffer as a result of a faltering mortgage market. Defendants' contention that Plaintiffs have improperly sued under a theory of parens patriae is not persuasive because the governmental Plaintiffs are representing their own state and municipal interests, not the interests of particular residents. The governmental Plaintiffs are within the zone of interests of the Safety and Soundness Act.

Under the APA, judicial review is only permissible for final agency action.  5 U.S.C. § 704.  Defendants contend that the FHFA's actions amounted to informal, non-final guidance.  "For an agency action to be final, the action must (1) 'mark the consummation of the agency's decisionmaking process' and (2) 'be one by which rights or obligations have been determined, or from which legal consequences will flow.'"  Ore. Natural Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977 (9th Cir. 2006).  To determine whether the consummation prong of the test has been satisfied, the court must make a pragmatic consideration of the effect of the action, not its label.  Id. at 982, 985.  The finality requirement is satisfied when an agency action imposes an obligation, denies a right, or fixes some legal relationship as a consummation of the administrative process.  Id. at 986-87.  "An agency action may be final if it has a 'direct and immediate . . . effect on the day-to-day business' of the subject party."  Id. at 987 (alteration in original).

In its July 2010 statement, the FHFA adopted the view that PACE programs that establish first liens are inconsistent with requirements contained in Fannie Mae's and Freddie Mac's Uniform Security Instruments.  FAC, Ex. A, at 10.  The FHFA announced that mortgages with such encumbrances were not suitable for purchase by the regulated entities.  Its statement affirmed that the prior lender letters issued by Fannie Mae and Freddie Mac, alerting sellers and servicers that first liens run contrary to their

United States District Court
For the Northern District of California

Uniform Security Instruments, would "remain in effect."  The FHFA arrived at this conclusion after "careful review" and "over a year of working with federal and state government agencies."  Indeed, the FHFA expressly conveyed its intent to "pause" PACE programs that include first liens.  See id.  The statement had a legal effect because it immediately imposed on the regulated entities obligations to take certain actions and it could reasonably be read to provide a basis for an enforcement action should the entities have chosen to continue purchasing mortgages encumbered by PACE liens.  The Safety and Soundness Act authorizes the FHFA Director to take enforcement action against regulated entities to police their lawful operation.  See e.g., 12 U.S.C. § 4631(a)(1).  The FHFA's July 2010 statement constituted a final action.

     B.  Notice and comment requirement

     Any regulations issued by the FHFA Director pursuant to the agency's general regulatory authority shall comply with the APA's requirements for notice and comment.  12 U.S.C. § 4526(b).  "Interpretative rules" are exempt from the notice and comment requirements.  5 U.S.C. § 553(b)(3)(A).  The interpretive rule exemption is narrowly construed.  Flagstaff Medical Center, Inc. v. Sullivan, 962 F.2d 879, 885 (9th Cir. 1992).  A court need not accept an agency's characterization of its rule.  Hemp Industries Ass'n v. DEA, 333 F.3d 1082, 1087 (9th Cir. 2003).  "There is no bright-line distinction between interpretative and substantive rules."  Flagstaff, 962 F.2d at 886.

An interpretive rule is one "'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'"  Erringer v. Thompson, 371 F.3d 625, 630 (9th Cir. 2004) (citing Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 88 (1995)).  "Because they generally clarify the application of a law in a specific situation, they are used more for discretionary fine-tuning than for general law making." Flagstaff, 962 F.2d at 886.

"If the rule cannot fairly be seen as interpreting a statute or a regulation," and if it is enforced, it is not an interpretive rule.  Catholic Health Initiatives v. Sebelius, 617 F.3d 490, 494 (9th Cir. 2010).  "To fall within the category of interpretive, the rule must derive a proposition from an existing document whose meaning compels or logically justifies the proposition.  The substance of the derived proposition must flow fairly from the substance of the existing document."  Id. (internal quotation marks omitted).  If the relevant statute or regulation consists of "vague or vacuous terms--such as 'fair and equitable,' 'just and reasonable,' 'in the public interest,' and the like--the process of announcing propositions that specify applications of those terms is not ordinarily one of interpretation, because those terms in themselves do not supply substance from which the propositions can be derived."  Id. at 494-95.

Substantive rules, sometimes referred to as legislative rules, "create rights, impose obligations, or effect a change in

34

existing law pursuant to authority delegated by Congress."

*Erringer*, 371 F.3d at 630.  The Ninth Circuit explains that

substantive rules have the "force of law," while interpretive

rules do not, and has adopted a three-part test for determining

whether a rule has the "force of law":

> (1)  when, in the absence of the rule, there would not
>      be an adequate legislative basis for enforcement
>      action;
>
> (2)  when the agency has explicitly invoked its
>      general legislative authority; or
>
> (3)  when the rule effectively amends a prior
>      legislative rule.

*Erringer*, 371 F.3d at 630 (citing *Hemp Indust.*, 333 F.3d at 1087).

Plaintiffs argue that the FHFA's directives against PACE

programs with a first lien feature constitute a substantive rule

because (1) they announced a "flat ban" against such encumbrances

and thus amounted to general-lawmaking; (2) they had the force of

law and created a basis for enforcement; (3) they were issued

pursuant to statutory authority; and (4) they changed a prior

policy.

Plaintiffs rely on *Catholic Health Initiatives*, 617 F.3d at

490.  There, a non-profit charitable corporation and its

affiliated non-profit hospitals challenged a rule describing

"reasonable costs" related to the care of Medicare beneficiaries.

In general, malpractice, workers' compensation and other liability

insurance premiums are considered by the Department of Health and

Human Services (HHS) to be part of a hospital's "reasonable costs"

incurred in providing services to Medicare beneficiaries and, as such, are reimbursable.  Id. at 491.  The Secretary of HHS had issued a Provider Reimbursement Manual containing guidelines and policies to implement Medicare regulations setting forth principles for determining the reasonable cost of provider services.  A provision in the manual disallowed reimbursements for insurance premiums paid to certain off-shore insurance corporations, known as "captives," often established by health care providers, where the corporations' investments failed to comply with certain requirements, such as a ten percent limit on equity investments and other restrictions.  Id. at 492.  Assuming without deciding that the manual's investment limitations were an "extension" of and consistent with the reasonable cost provisions of the Medicare Act and its regulations, the court concluded that the limitations did not represent an interpretation of the statute or its regulations.  Id. at 496.  The court noted that it might have been "a closer case if the Secretary's Manual had indicated that premiums paid to financially unstable captive offshore (or domestic) insurance companies do not represent 'reasonable costs.' But [the provision] embodies a 'flat' rule, and the 'flatter' a rule is, the harder it is to conceive of it as merely spelling out what is in some sense latent in the statute or regulation."  Id. at 496 n.6.  The manual's investment requirements were "simply too attenuated" from the reasonable cost provisions of the Medicare

United States District Court
For the Northern District of California

Act to represent an interpretation of the statutory terms.  Id. at 496.

The "safe and sound" operation of the Enterprises' business is likewise a vague phrase.  The FHFA's July 2010 statement gives substance to the duties of the regulated entities to conduct their operations in a "safe and sound" manner because the statutory language alone does not compel a rule barring the purchase of all mortgages with PACE first liens.  The FHFA's statement that PACE first liens "present significant safety and soundness concerns," such that mortgages encumbered by them are not suitable for purchase, is a categorical ban.  The rule is flat in the sense that it is a bright-line standard.

Without the FHFA's July 2010 pronouncement it is unlikely that the agency would have a basis for an enforcement action against the regulated entities because the safety and soundness duty is vague and non-specific.

This case is distinguishable from Erringer, where the Ninth Circuit held that the Medicare Act contained a standard of approval for Medicare beneficiaries' claims and that HHS guidelines issued to claims-processing contractors were interpretive.  In Erringer, a class of Medicare beneficiaries challenged rules issued by the Secretary of HHS giving criteria to contractors in creating Local Coverage Determinations (LCDs).  The Secretary issued National Coverage Determinations (NCDs), excluding certain items and services from Medicare coverage that

**United States District Court**
For the Northern District of California

were not "reasonable and necessary" under the Secretary's interpretation.  The contractors generally relied on the NCDs in processing claims.  However, the contractors were required to create and use LCDs to determine what claims were covered under Medicare, and at what amounts, when no NCD applied to a claim.  The beneficiaries argued that the Secretary's criteria governing the creation of LCDs should be subject to the APA's notice and comment requirement.  The Ninth Circuit reasoned that the guidelines were interpretive because, even without them, the contractors would have an over-arching duty to provide Medicare coverage that was reasonable and necessary.

The holding that the Secretary's general guidelines for the creation of the LCDs were interpretative does not establish that the specific directives made by the FHFA here were interpretive.  As noted earlier, the requirement that the regulated entities operate in a safe and sound manner is a non-specific mandate; it is a less precise requirement than Medicare contractors' statutory duty to provide coverage for treatments that are reasonable and necessary to cure disease and alleviate illness.  A given medical diagnosis or condition is bound to compel certain reasonable and necessary treatment as determined by medical professionals.  In comparison to the guidelines for approving Medicare claims, the FHFA's directives barring the purchase of mortgages encumbered by PACE first liens is not compelled by the statutory mandate that

United States District Court
For the Northern District of California

the FHFA ensure that the regulated entities operate in a safe and sound manner.

Furthermore, as the Court previously noted in connection with its conclusion that the FHFA acted as a regulator, here the FHFA's handling of its rule-making pertaining to private transfer fee covenants supports a finding that the FHFA's PACE directives amounted to substantive rule-making.  The FHFA utilized the notice and comment process with respect to its proposed rule restricting the regulated entities from purchasing mortgages on properties encumbered by private transfer fee covenants because such covenants were deemed to undermine the safety and soundness of their investments.  75 Fed. Reg. 49932 (Aug. 16, 2010).  In that analogous instance, the FHFA deemed it appropriate to comply with the APA notice and comment requirements.

The FHFA's directives on PACE obligations amount to substantive rule-making, not an interpretation of rules that would be exempt from the notice and comment requirement.  The notice and comment process must be followed.

C.  Arbitrary and capricious action

In addition to their procedural notice and comment claim under the APA, Plaintiffs allege a substantive claim that the FHFA's directives are arbitrary and capricious.  Under § 706(2)(A) of the Act, "an agency action may be found unlawful by a reviewing court and set aside, if it is found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."

39

5 U.S.C. § 706(2)(A).  Plaintiffs have stated that, if the Court rules that the FHFA violated the APA by failing to carry out the notice and comment process, as the Court has done above, it need not reach their claim that the directives were arbitrary and capricious.  See Sprint Corp. v. FCC, 315 F.3d 369, 377 (D.C. Cir. 2003).

The Court notes that the FHFA has begun the notice and comment process pursuant to the preliminary injunction that the Court granted earlier in this case.  On January 26, 2012, the FHFA issued an Advance Notice of Proposed Rulemaking seeking comment on whether the restriction set forth in the July 2010 statement and the February 2011 letter should be maintained.  77 Fed. Reg. 3958. The FHFA received 33,000 comments in response to the notice.  77 Fed. Reg. 36086.  On June 15, 2012, the FHFA issued a Notice of Proposed Rulemaking and Proposed Rule concerning underwriting standards for Fannie Mae and Freddie Mac related to PACE programs. Id.  The ninety-day comment period ends on September 13, 2012. Docket No. 193.  In turn, the FHFA is required to issue a regulation within a reasonable time.  Thus, on Plaintiffs' suggestion, the Court declines to rule on the arbitrariness of the FHFA's directives.

III. NEPA Claims

As with their claim of arbitrariness under the APA, Plaintiffs assert that the Court need not resolve the merits of their NEPA claim if the Court holds that the FHFA was required to

United States District Court
For the Northern District of California

pursue the notice and comment process prior to issuing its directives as to the PACE loans.  Given the Court's order that the ongoing notice and comment process continue, the Court declines to resolve the NEPA claim in this case.

CONCLUSION

Plaintiffs' motion for summary judgment is granted with respect to their notice and comment claim under the APA, and Defendants' cross-motion for summary judgment on the claim is denied.  For the reasons explained above, the Court finds it unnecessary to rule on the remaining claims under the APA and the NEPA.

Accordingly, the FHFA shall complete the notice and comment process and publish a final rule to consummate that process.  The parties shall attempt to agree to an appropriate deadline for publication of the final rule and notify the Court of that date, or, if the parties cannot agree, Plaintiffs shall submit an administrative motion, pursuant to the Northern District of California's Local Rule 7-11, for the Court to impose a deadline. Defendants shall respond in accordance with the Local Rule.  The Court retains jurisdiction of this action as necessary to ensure compliance with this order.

IT IS SO ORDERED.

Dated:  8/9/2012

CLAUDIA WILKEN
United States District Judge